## SOUTHERN SURETY CO. v. SHOOK et al.
### No. 905.

Court of Civil Appeals of Texas. Eastland.
Nov. 6, 1931.

Rehearing Denied Dec. 11, 1931.

Conner & McRae, of Eastland, for appellant.

Robert L. Thompson, of Stephenville, and Owen & Owen, of Eastland, for appellees.

HICKMAN, C. J.

This suit was instituted by appellees, Mrs. Sarah Shook and her children, to set aside an order of the Industrial Accident Board denying them any compensation for the death of Lucien Shook, a single man, the son of Mrs. Sarah Shook and the brother of the other appellees. It resulted in a judgment in their favor for $5,579.65, which amount included past-due weekly payments, with interest thereon, and a lump sum representing the present worth of future weekly payments. There is no dispute with reference to the facts. Appellant placed no witnesses on the stand, and offered no evidence except cross-interrogatories in certain depositions.

The deceased was employed by the Braden Company as a pumper on the Stinnett lease in the northwestern part of Eastland county. He had been employed by that company for more than six years prior to his death at a salary of $120 per month. The lease was in a sparsely settled, rough, mountainous country. Shook lived alone in a two-room shack on the lease. This shack was the property of the employer, and was erected as a place of abode for the employee. Near his shack was a producing oil well, the only well on the lease. Oil was pumped from this well by an engine using natural gas for fuel, and but slight attention was required to keep same in operation. So long as the engine was properly oiled, it would run automatically, and had been known to run for as long as two days at a time without attention.

By the terms of his employment, the deceased was on duty twenty-four hours per day, and was required to reside on the premises. His duties were to keep the pumping operations going and to report to the superintendent when the rods needed to be drawn

and the well cleaned, or when some other condition arose needing attention which he was not able personally to give. He kept an automobile, and erected a shed for its shelter. He also kept a pack of hounds, and erected a doghouse for them. His duties did not require that he stay at the well or shack constantly, but he was free to go and come. His superintendent knew that he kept hound dogs at his shack, and that he hunted with them in the vicinity of the lease. That was not objectionable to the superintendent. To provide another means of diversion, the employee maintained a croquet court near his shack. He was paid his salary once each month, usually on the fourth to seventh day of the month. Near the shack was a water well for his use, and about a quarter of a mile southeast of the shack was a water tank on land belonging to S. A. Davis. There was a partition fence about 90 feet south of the shack separating the Stinnett lease from the Davis land. The employee got some of the water used by him for domestic purposes from this water tank and some from the well. He owned an electric lantern, known as a "Dad's Lantern," which he used about his shack and when hunting at night.

Three boys, Clyde Thompson, Thomas Davis, and Woodrow Davis, who lived in that portion of the county where the Stinnett lease is situated, left the home of S. A. Davis, the father of Thomas and Woodrow Davis, about 6 o'clock p. m. on September 7, 1928, for the express purpose of going hunting. They went about one and a half miles to a railroad; thence up the track about three-quarters of a mile to the employee's shack. The shack was about 100 yards east of the railroad track. On the way over to the shack, Woodrow Davis discovered a pistol sticking out of Clyde Thompson's shirt, and asked him what he was going to do with it. Thomas Davis testified that "Clyde said that this would be the last time that Lucien Shook would ever see the sun go down. After that he said he was going to rob him." Woodrow Davis testified on this point as follows: "I asked him what he was going to do with the gun and he said he was going to murder Shook, and I asked him what he was going to do that for and he said 'to see him kick.'"

When the boys reached the shack, they found Lucien in bed. They also found that his brother, Leon, was at the shack visiting him. On arriving at the shack, Clyde Thompson called out to Shook and asked him if he had a gun. On being answered in the affirmative, Thompson told him that he had some wolves bayed over on the hill about a half mile distant, and wanted Shook to go with him to help get them out. Shook consented, and he and his brother arose and dressed, got the "Dad's Lantern" and hounds, and the five started in the direction of the place where Thompson said the wolves were bayed.

There were, in fact, no wolves bayed there, and nothing was said by Thompson to the Davis boys on the way to the shack about there being any wolves. This story about the wolves was concocted by Thompson for the purpose of luring Shook from his shack. The hunting party proceeded from the shack in single file in the following order: Lucien Shook, Leon Shook, Clyde Thompson, Thomas Davis, and Woodrow Davis. When about to the tank on the Davis land a quarter of a mile from the shack, Clyde Thompson killed both of the Shook boys. It is not necessary to recite here the harrowing details of this atrocious murder, but it is sufficient, for the purpose of this decision, to state that they disclose conclusively that robbery was the motive, and that, had not his plans been thwarted, Thompson, after robbing Lucien's body of cash and a watch, and after robbing the shack, would have taken the bodies of his victims to the shack and set it on fire. The foregoing is not a full statement of all the facts, but will suffice, we think, for an understanding of the questions of law hereinafter discussed.

In answer to a special issue, the jury found that the employee sustained his injuries while in the course of his employment. At the conclusion of the evidence, appellant requested a peremptory instruction, and the question is here presented that such instruction should have been given, because said injuries were not received in the course of the employment of the deceased. Article 8309, § 1, R. S. 1925, provides:

"The term 'injury sustained in the course of employment,' as used in this law, shall not include: * * *

"2. An injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment."

In the case of Vivier v. Lumbermen's Indemity Exchange (Tex. Com. App.) 250 S. W. 417, 418, this particular provision was construed as follows: "As we apprehend the intention of the Legislature, it was to apply to such cases where antecedent malice existing in the mind of another causing the other to follow the employee and inflict injury upon him, wherever he was to be found, or to cases where the employee by his own initiative provoked a difficulty which caused the other party to feel a 'personal' interest in assaulting him."

Since this decision, the statute has been re-enacted without change. We therefore accept the above quotation as the proper interpretation of the meaning of the statute. Applying it to the facts of the instant case, the solution is not difficult. No antecedent malice on the part of Clyde Thompson toward the employee is even suggested by the record.

On the contrary, the motive for the killing was robbery, possibly commingled with a desire on the part of a depraved mind to "see him kick." Neither does the record suggest that the employee by his own initiative provoked the difficulty which caused Thompson to feel a personal interest in assaulting him. There was no previous difficulty. We therefore conclude that the death of the employee was not brought about by "reasons personal" to him. Vivier Case, supra, and authorities there cited.

■ The same article of the statute from which the above quotation is taken, after providing that injuries sustained in the course of employment shall not include certain described injuries, contains this language: " * * * But shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

It is the position of appellant that the evidence in this case discloses that the injuries did not have to do with and originate in the work of the employer, and were not received by the employee while engaged in and about the furtherance of the affairs or business of the employer. As in the construction of the portion of the statute first above quoted, so in the construction of this portion, we have an authoritative guide. In the case of Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S. W. 72, 73, 28 A. L. R. 1402, Justice Greenwood, speaking for our Supreme Court, uses this language:

"An injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business. As tersely put by the Supreme Court of Iowa:

" 'What the law intends is to protect the employee against the risk or hazard taken in order to perform the master's task.'—Pace v. Appanoose County, 184 Iowa, 498, 168 N. W. 916, 918."

■ Did Lucien Shook's injuries result from a hazard reasonably inherent in or incident to the conduct of his work as pumper? We think they did. By the terms of his employment, he was on duty twenty-four hours each day, and was housed in a shack belonging to the employer and erected near the pump in order that he might be available for duty at all times. It would doubtless not be questioned that he was on duty while asleep, or while eating, or tending to other necessary wants. When a man is employed to work at any job, the fact that he is a human, with ordinary human habits and requirements, is necessarily taken into consideration. Had the murder occurred while the employee was providing water or fuel for his own comfort, no question could be made that he was then in the course of his employment in furthering the master's business. The evidence discloses that he was murdered near a tank on an adjoining tract of land. Had he gone to that tank to take a bath or procure water for his use in the shack and been murdered while there, he would clearly have been at the time of his death in the course of his employment. The question is: Was he in the course of his employment while hunting near the premises or indulging in other forms of recreation and diversion? The case is the same as if he had been murdered while playing croquet. The employer knew that he hunted and played croquet as means of exercise and diversion. It is a matter of universal knowledge that a certain amount of recreation is not only desirable, but absolutely necessary to one's well being and to the proper discharge of his duties. The pump could be heard for more than a mile away, and the hunting trip was to be for only a half mile. We can see no valid or just reason for holding that there is any substantial difference, with relation to the question of whether the employee was in the course of his employment, between an injury received while engaging in necessary diversion known and permitted by the employer and one received while the employee is sleeping or tending to any other necessary duty common to mankind.

■ The Workmen's Compensation Law should not be hedged about with strict construction, but should be given a liberal construction to carry out its evident purpose. It would be a narrow and very strict construction that would require a pumper to sit by his pump at all times in order to claim protection as an employee. He was only required, under this law, to carry on the business of his master, and much latitude was allowed him because of the very nature of his work. His superintendent testified: "As to what his duties were with respect to staying right at the well in his contract of employment, we left that up to his own judgment." It is our conclusion, upon both reason and authority, that the employee did not forfeit his claim for compensation by embarking on what he thought to be a wolf hunt near his premises. Lumberman's Reciprocal Ass'n v. Behnken, supra; Cassel v. Fidelity & Guaranty Co., 115 Tex. 389, 283 S. W. 127, 46 A. L. R. 1137; Vivier v. Lumbermen's Indemnity Exch., supra.

■ In viewing these facts from another angle, we arrive at the same conclusion. Lucien Shook was not killed because he went hunting. The evidence compels the conclusion that he would have been killed had he

not consented to the hunt. A fair inference from the record is that this hunting subterfuge was born in the mind of Clyde Thompson after he discovered the presence of Leon Shook. As above pointed out, had Thompson come to Shook's shack and, for the purpose of robbery, killed him while he was asleep, no question would arise as to the right of recovery by the beneficiaries. The hunting was merely incidental, and did not in any manner contribute to cause the injuries. In the case of Royal Indemnity Co. v. Hogan (Tex. Civ. App.) 4 S.W.(2d) 93, 96 (error refused), a garage employee was killed while driving a car for the purpose of testing its brakes. It was in the line of his duty to test cars on the public street, but was contrary to the rules of his employer for him to pick up guests while doing so. Contrary to these instructions, he picked up two young ladies while out in the performance of his duties, and, while taking them home, was killed in a collision. In holding that the violation of this instruction did not preclude his beneficiaries from a recovery, the opinion uses this language: "The taking of the young ladies to ride with him in the car and the testing of the car without specific instructions from Red [the employer] were merely incidental and did not in any manner contribute to cause the accident."

That opinion seems to proceed upon the theory, and we think the correct one, that, if the employee would have suffered the same injury had he not incidentally turned aside, then his turning aside is immaterial. In the instant case, we believe that the employee was actually in the discharge of his duty under the terms of his contract when he was killed; but, if he should be regarded as having turned aside temporarily therefrom, such turning aside was but incidental, and did not contribute to his death. He would have suffered the same fate had he not agreed to go hunting. Under this view, the fact that the employee was killed while hunting does not preclude recovery by his beneficiaries.

There are questions of the admissibility of the evidence and the action of the court in not sustaining special exceptions and other similar questions presented in appellant's brief, but, under our view of this case, they become immaterial. The petition supports the judgment. There was no dispute in this evidence. Should we sustain these assignments, reversal would not follow, because a peremptory instruction would have been justified and should have been given, and the questions raised have no bearing on that question. But we have, nevertheless, considered these assignments, and they are overruled. A discussion of them would further lengthen the opinion without serving any useful purpose.

Appellant presents one assignment which appellees practically concede to be well taken. That assignment questions the sufficiency of the evidence to warrant a judgment for a lump sum. We sustain this assignment, without discussing the evidence, and hold that the facts do not justify the finding as to some of the appellees. But this holding does not necessitate a reversal of the judgment below. Appellees have expressed a willingness for a reformation thereof. We have the authority to reform in this particular. Maryland Casualty Co. v. Graham (Tex. Civ. App.) 38 S.W.(2d) 909.

We accordingly reform the judgment of the court below so as to award appellees judgment against appellant for all past-due weekly installments, with 6 per cent. interest on each from the maturity thereof, and for future weekly installments to the end of the compensation period.

Reformed and affirmed.

### On Rehearing.

An able and exhaustive motion for rehearing has been filed by appellant which deserves, and has received, careful consideration. We perhaps did not use apt words in expressing our holding in the original opinion, as same seems to have been misunderstood by appellant's counsel. We therefore deem it advisable to write further.

It is contended that, by the express terms of article 8309, § 1, quoted in our original opinion, Shook did not sustain his injuries in the course of his employment. The argument seems to be that the decision by the Commission of Appeals in the Vivier Case, from which we quoted, is wrong. This contention, we think, comes from an improper interpretation of the meaning of the words employed in that section. To make our thought plain, we again quote it and italicize certain words: "An injury caused by an act of a third person intended to injure the employee because of reasons personal to *him* and not directed against *him* as an employee, or because of *his* employment."

It will be noted that there are three personal pronouns in this sentence. Appellant construes the sentence as though the first "him" has for its antecedent "a third person," and the second "him" and also "his" have for their antecedent "the employee." Thus construed, its contention would probably be correct, for, unquestionably, Clyde Thompson murdered Lucien Shook for the purpose of robbery. That was a reason personal to Clyde Thompson. We know of no rule of grammatical construction that would not give the same antecedent to each of those three personal pronouns. At any rate, the language is susceptible of that construction. Being so susceptible, it is our duty thus to construe it, for any other construction would be contrary to the purposes of the legislation as a whole. If an employee under the Workmen's Com-

pensation Law is employed as a night watchman at a bank, and robbers, for the purpose of making an entry into the safe, murder him, such act on the part of the robbers might be said to be personal to them in the sense that they did it to further their own purpose of robbery, but clearly the beneficiaries of the deceased watchman would be entitled to compensation. He was killed because he was a watchman, and, therefore, because of his employment, and not because of some malice harbored by the robber against him personally. This is a comparable case.

It is argued that we went far afield in holding that Shook was in the course of his employment while hunting wolves. These interrogatories are propounded to us in the motion: "If Shook had taken his girl to a dance some half mile from the premises, and while dancing a third person, with an intent of killing someone else, had shot a pistol and Shook had been accidentally hit and killed, would he have been engaged in the course of his employment at the time he was killed? Or, suppose he had been at such place engaged in playing poker and while so engaged had been killed, or suppose he had been at such place engaged in a drinking party or dinner party or playing base ball. Those undertakings might have afforded some exercise or amusement or pleasure to Shook. Yet, we doubt if it would, in either of such instances, be seriously contended that Shook would have been engaged in the course of his employment."

 The facts stated in the interrogatories are not in sufficient detail in each instance for us to answer them categorically. But we shall undertake again to try to make our position plain. Shook actually labored at the well but a few minutes during each twenty-four hours, if we regard labor to mean only the oiling of the engine. He was employed to stay within hearing distance of the pump, with liberties to go to town when desirable. We are not called upon to pass on the status of the employee while beyond hearing distance from the pump. So long as he was there within hearing distance, ready to go to the well when called thereto by observing that the engine had stopped performing, he was in the course of his employment. The logical conclusion of appellant's argument is that he was on employment only when he was actually at work. Under the strict construction which it employed he was not on duty while sitting in his shack listening to the engine. Our view is that, so long as he was in a zone where he could hear the engine and was in a position where he could go to it when occasion arose, it could make no difference whether he were sitting quietly in his shack, sleeping, eating, exercising, dancing, playing cards, or doing anything else. Of course, if the dancing, card playing, etc.,

afforded the reason for his being murdered, a different case would be presented. Suppose he and his brother had been dancing or playing cards together or with others in the shack when these boys came up and Thompson had then shot him for the purpose of robbery. Should that fact operate to deny a right of recovery? We think not.

Shook's employment was analogous to that of a driver of a fire truck. He spends twenty-four hours per day in and around the fire station to be in readiness to go to a fire when an alarm is turned in. Could it be reasonably and justly contended that such fireman would not be in the course of his employment while playing games in the fire station or playing croquet or baseball on the outside within convenient distance thereof and within hearing of the gong? Surely not. The same reasoning that would exclude Shook under the facts of this case would likewise exclude the fireman under the facts of the suggested case.

The motion will be overruled.