ÆTNA LIFE INS. CO. v. MATTHEWS et al.

No. 11132.

Court of Civil Appeals of Texas. Dallas.

Feb. 6, 1932.

Rehearing Denied March 19, 1932.

Lawther, Cox & Cramer, of Dallas, for appellant.

R. H. Vogel, of Dallas, for appellees. ·

VAUGHAN, J.

This is a compensation suit, the judgment appealed from having been rendered in the following causes duly consolidated, viz.: No. 82427, Ætna Life Insurance Company v. Mrs. Jessie Matthews, Jack Matthews, and Anita Matthews; and No. 92429-A, Joan Matthews, by Next·Friend, etc., v. Ætna Life Insurance Company. All proceedings had, leading up to and including the consolidation of said causes, not being in any respect questioned, only the proceedings subsequent thereto and as to the liability of appellant being presented for our review, we find it only necessary to make the following statement in reference to the nature and result of the suit:

Appellee Mrs. Jessie Matthews is the surviving wife of Orville Le Roy Matthews, and appellees Jack, Anita, and Joan Matthews are the minor children of deceased and said Mrs. Jessie Matthews. On September 1, 1928, deceased, then an employee of the Republic National Bank & Trust Company of Dallas, while on his way to the bank to begin work, was shot and killed by one V. Ray Adams upon a public street in the city of Dallas. Several days previous to the homicide, a wager was made on the result of a certain primary election to select the candidate for United States Senator. One Ben C. Richards, Jr., acting for others, bet $1,000 on one candidate, and one T. W. Ramsey, Jr., bet $1,000 on the other candidate. Both parties to the bet went into the Republic Bank and requested deceased, who was in charge of the new accounts department, to act as stakeholder; this he agreed to do, provided each of the parties would obtain a cashier's check for $1,000 made payable to his (Matthews') order. Said checks were obtained and handed to deceased to be delivered by him to the winner. In the primary election, the race was won by the candidate on whom Ramsey had bet.

Richards prepared a forged order from Ramsey authorizing deceased to pay the wager to one Clyde R. Vest, and gave the forged paper to one A. A. Crabb, who took same to Waco and affixed thereto a McLennan county notary seal. Crabb telegraphed deceased from Waco, under the name of Ramsey, about the payment of the money to Vest. The next morning, deceased indorsed and delivered the two checks to Crabb, who posed as Vest, and the checks were cashed and Richards took the money, less what he paid to Crabb for .his services. Later, Ramsey and Adams, the parties to the bet, demanded the money from deceased, who told them he had paid it to Vest upon Ramsey's order. This demand was renewed several times, and deceased not complying therewith, on the grounds above stated, was shot and killed by Adams.

From an award of. the Industrial Accident Board, awarding compensation to the widow and two minor children, appellant appealed to one of the district courts of Dallas county. Later, claim was made for compensation on behalf of Joan Matthews, a posthumous child, and, from a board order refusing to hear the claim, suit was filed in one of the district courts of Dallas county on behalf of said minor. The suits were consolidated by proper orders, and on January 3, 1931, the consolidated suit was tried to a jury on special issues. Upon the findings of the jury, judgment was rendered against appellant in favor of appellees for $7,055.36, with 6 per

cent. interest and costs, apportioned one half to the widow and the other half divided equally among the three minor children.

Under the view we take of this appeal, it is not necessary to detail the findings of the jury, in response to the several special issues submitted, further than to say all were in favor of appellees; this because the validity of the judgment rendered must be determined upon and by appellant's assignment of error No. 1, viz.: That the court erred in refusing to give to the jury its special charge No. 1, instructing the jury to return a verdict for appellant, said refusal being assigned as error on each of the following grounds, to wit:

"(a) Because it was uncontroverted under the evidence that at the time of the killing the deceased was not engaged in or about the furtherance of the affairs or business of his employer;

"(b) Because there was in the record no competent evidence that the killing had to do with and originated in the work, trade, business or profession of the employer;

"(c) Because, if there was evidence that the killing originated and had to do with the holding of the stakes, it was uncontroverted that the holding of the stakes was a part of an illegal transaction, to-wit: a wager on the result of a public election; that the holding of the stakes was no part of the business of the bank; that the holding of the stakes was an act which the bank under its charter and the law was not empowered or authorized to do; that in holding the stakes deceased was not acting for the bank; and that in holding the stakes the deceased was acting in his individual capacity;·

"(d) Because it was uncontroverted that the killing was the act of a third person intended to injure the deceased and there was no competent evidence that the act of killing was not directed against deceased because of reasons personal to him and not directed against him as an employee, or because of his employment."

In order to pass upon the above grounds, it was necessary that we carefully consider and give due probative effect to all of the evidence that, in any respect, supports the judgment rendered in favor of appellees. This duty we have discharged and present what we believe to be all of the cogent facts established by the evidence, supporting said judgment, viz.: Said Richards, witness for appellees, testified that he was interested in working for Senator Mayfield's election in the Mayfield-Connerly senatorial election of 1928; that he then officed on the eighth floor of the Republic National Bank Building; that he had something to do with a bet made on that election. In reference to the bet being placed and what took place in reference thereto, we think it well to quote the testimony of said witness, viz.:

"Q. Tell the jury when that matter first came to your—when the matter of the making of the bet first came to your knowledge? A. Well Morris Mayfield, a brother of Earle, called on me and asked me if I would hold stakes and I told him I was not accustomed to holding stakes in an election bet. He then asked me if I would get someone to hold stakes in this election bet, and I told him that I would do my best. He then asked me who would I suggest and he said, 'well you office in the Republic Bank Building,' of course I said, 'yes,' and he asked me would I go down to the bank and get someone there in the bank to hold the stakes. He sent this man Adams and a man by the name of Weir who was connected with the Mayfield headquarters with the money that he wanted to bet in this election. I then went down to the bank and he paid me the money. We went down to see Mr. Gannon, who is there in the bank. Mr. Gannon could not be interviewed for sometime. This was about twelve o'clock. I could not talk to Mr. Gannon and then we talked to Mr. Matthews.

"Q. That is O. L. Matthews? A. Yes sir, the young man at the Republic National Bank. I had known Mr. Matthews there in connection with opening up my account there in the bank; I did my business with the Republic National Bank and I asked him would he hold stakes in this election bet. We had the money, the cash, $1,000 each and put it there on the table, and asked him would he hold the stakes, he said he would if it was done in a businesslike manner, and he suggested that we get a cashier's check, as the officials of the bank would want them; the officials of the bank would want it that way, and we proceeded to get cashier's checks there at the window just a few steps from his desk, and we decided to have the checks made out to O. L. Matthews; we did that for the reason and for the purpose of whoever won the money, that Mr. Matthews could endorse the checks over and pay it to the winner.

"Q. These gentlemen (referring to V. Ray Adams and Morris Mayfield) phoned you and asked you to meet them, they were downstairs, weren't they? A. Mr. Mayfield called me on the telephone and asked me would I hold stakes and when I told him that I was not accustomed to holding stakes, then he said will you not go down to the bank and get the bank to hold the stakes for you; and I said 'yes,' and that is what I did. I went downstairs and tried to get hold of Mr. Gannon and Mr. Florence; they were both out and I talked to Mr. Matthews."

Said witness further testified to the following facts: "Mr. Matthews was not any particular friend of mine. I did not know him other than as an employee of the bank. We went to the window and presented the $2,000 and had the cashier's checks issued; had two

cashier's checks issued. The $2,000 in money was paid in at the bank to the man who issued the cashier's checks and was left there with the bank. The two $1,000 cashier's checks were drawn on the Republic National Bank & Trust Company and payable to O. L. Matthews. We took them over to some officer's desk there in the bank and they signed them, and we left them at Mr. Matthews' desk. He had the checks all of the time."

R. Williams, vice president of the bank, testified to the following facts, viz.: That he had been with the bank for eleven years and four months, had known the deceased for about eight years, during which time he was in the employ of the bank; that the deceased started out as secretary to Mr. Gonnor, then president of the Day & Night Bank, which later became the Republic Bank & Trust Company; that deceased filled said position as secretary until he was promoted to the new accounts desk several years ago; that deceased had grown up with the bank, was looked upon as a valued employee, had more authority than the other employees, and practically as much authority as a junior officer in the bank; that he had the right to exercise discretion in the matter of what he would do in order to advance the interest of the bank; that while his duties were primarily within the bank building, yet he worked and was paid by the month and was expected to perform services outside of the bank building and not within banking hours should the necessity therefor arise; that many courtesies necessarily had to be extended to customers and prospective customers of the bank from time to time, in order to build up good will for the bank; that although direct and immediate profit or benefit might not come to the bank, yet it was a part of deceased's duties to exercise his discretion in the matter of performing such courtesies; that as long as cashier's checks remained outstanding and unpaid the bank had the use of such money without interest; that this fund is in the nature of a "revolving fund," that is, when a great volume of business is built up by such checks, there is on hand in the bank at all times a corresponding volume of money which may be used by it for loan purposes, that is the cashing of the outstanding checks is more or less set off by the payment to the bank of new money for new checks; "that he had held stakes as an employee and as an officer there in the bank many times in election bets, held some stakes in the same election, thought that he was permitted to hold them; that he knew nothing about the controversy over the $2,000 until Mr. Matthews came to him the day before he was killed and told him the whole story; that he made arrangement for Matthews to meet him at his desk and if he felt like he was guilty he would straighten it out the next morning; that the afternoon before Matthews was killed, he had a conversation with him; that Matthews told him (Williams) that Adams claimed that he (Matthews) had been a party to the scheme to beat him out of the money; that Matthews was to meet him (Williams) at the bank the next morning at eight o'clock; that Matthews told him (Williams) that it would be straightened out the next day, he felt morally responsible, he was hurt about it; that he, Williams, told Matthews to forget that and that if he had been beaten out of the money, that we would get it straightened out in less than 30 days; that the bank would see to it."

Mrs. Mamie Williamson, witness for appellees, testified: That on the morning of September 1, 1928, the day when deceased was shot, she was walking west on the North side of Main street west of Akard; that her attention was directed to people on the sidewalk down Main street. In answer to a question in this respect, she said: "Well, in walking down the street I noticed three men standing together and I—I do not know whether there was four men there or not, but I am sure there was three men there when my attention was called by the man facing me drawing a gun from his pocket; they were standing facing each other and he turned and ran up the street."

She further testified that the man that was facing her and who drew the gun was V. Ray Adams; that Matthews was the man who turned and ran up the street; that she heard shots immediately. The following agreement was dictated into the record: "It is agreed that following Mrs. Mamie Williamson's testimony that V. Ray Adams shot Orville Matthews several times, and that each time Orville Matthews was running in an effort to escape the point where V. Ray Adams—where Mrs. Williamson testified she first saw them, which was east along the North side of Main Street and across Akard Street; and that he ran and got upon the sidewalk at the corner of Akard and Main Streets where he fell; that V. Ray Adams shot him in the back of his head, * * * and that he ran always in a direction from the bank, and that he died as a result of those pistol wounds received in Dallas, Dallas County, Texas."

Fred F. Florence, president of the bank, testified: "R. Williams had authority to act for the bank in this matter, and whatever effort he made in the matter of attempting to straighten it out was done with the bank's authority. In other words, he had authority, as an officer of the bank, to do the things that he felt would be to the best interest of the bank * * *. Orville Matthews was hired by the month. His specific duties were in the banking room proper—after banking hours and before banking hours, if he was going to work and should meet a man that had a grievance against the bank, it would have been a part of his duty to try to pacify the man and attempt to iron it out and see what

he could do about it. Mr. Matthews had almost as much authority as a minor officer in the bank. The bank delegated that to him and expected him to use it for the best interests for the bank. I do not recall that any specific instructions were ever given by the bank to its officers or employees not to hold stakes in an election bet. I do not think there was ever a discussion on the matter. The bank has a reserve fund—if a person comes in the bank and buys a cashier's check for $1,000 and that check remains unpaid for a month, the bank has the use of that $1,000 for a month—and the bank, of course, is interested in building up the amount of cashier's checks that it writes for that reason. That is one of the sources of money that the bank has to loan. Any time an employee of the bank has somebody putting up cashier's check there, then he is furthering the interests of the bank."

Florence further testified that there existed no custom on or prior to September 1, 1928, for the bank to act as a stakeholder in bets on the results of a public election held in the state of Texas; that it was not any part of the bank's business to act as a stakeholder in such transactions; and as per questions and answers further testified, viz.:

"Q. Did you ever, in your capacity, as president of the Republic Bank & Trust Company, or as far as you know, had any officer of the bank ever given authority or instructions to the employees of the bank to act for such bank in the holding of such stakes in election bets? A. No sir, not that I know of. We never have. Of course some may have done it but if they did it was not under the directions of the bank.

"Q. Had you as president of the bank, or in so far as you know, or any other director of the bank, or officer thereof, ever given Mr. Orville Matthews instructions or authority to act for the bank in the holding of any election bets? A. No sir."

The following agreement was made by appellant in open court: "That Orville L. Matthews delivered to A. A. Crabb the two $1,000 cashier's checks in the presence of Ben C. Richards, Jr. in the Republic National Bank & Trust Company in Dallas, Dallas County, Texas; that A. A. Crabb, in consummation with the agreement with Ben C. Richards, Jr. had gone to Waco, Texas, and had there sent to O. L. Matthews a telegraph introduced in evidence yesterday of date August 29, 1928, signed W. Tom Ramsey."

The wire referred to reads as follows: "O. L. Matthews c-o Republic National Bank, Dallas, Texas. Called to South Texas. Please deliver my checks to Clyde R. Vest who will have letter of authority. W. Tom Ramsey, Jr."

R. Williams testified that the above wire was shown him by deceased. The agreement made by appellee further recited:

" * * * That A. A. Crabb took with him to Waco a letter of date August 28, 1928, introduced in evidence by Mr. Leachman yesterday, purporting to have been signed by 'W. Tom Ramsey to Clyde R. Vest, containing the signature of Ora Millican'; that A. A. Crabb placed thereon the name of Clyde R. Vest and placed thereon the notary public's seal. The letter referred to in the above agreement is as follows:

" 'Waco, Texas. August 28, 1928. Mr. O. L. Matthews, c-o Republic National Bank, Dallas, Texas. Dear Sir: This is your authority to deliver my checks to Clyde R. Vest, whose signature appears below mine. Yours very truly, W. Tom Ramsey. Clyde R. Vest, Waco, Texas.' "

Appellant further agreed in open court that: "Upon coming back to Dallas in consummation of that agreement, A. A. Crabb went to the bank and had a discussion with Matthews as shown on this letter dated August 28th, 1929; that then upon Ben C. Richards being called to the bank by Matthews, the said Ben C. Richards identified A. A. Crabb as Clyde R. Vest, and that in consummation of that, the two checks were delivered to Crabb by Matthews after Matthews had indorsed the two checks to the order of Clyde R. Vest; that then Ben C. Richards indorsed the checks and A. A. Crabb cashed the checks and delivered the proceeds thereof to Ben C. Richards, Jr."

The testimony of Crabb exonerates deceased from having any knowledge of the acts and conduct on the part of said Crabb, and Richards, referred to in the above agreements, or of having knowingly participated therein, whereby the cashier's checks were delivered to said Crabb by Matthews under the belief on the part of deceased that he was Clyde R. Vest, and was entitled to receive said checks; that said checks were delivered after the senatorial election run-off, and after Senator Tom C. Connerly was announced as the winner; that said Crabb never did talk to W. Tom Ramsey or Ray V. Adams, in fact never at any time met either one of them before said checks were delivered by him.

N. Z. Cross, witness for appellee, testified: That he was in the barber shop business; that he saw said Ramsey and Adams in his place of business before Adams shot Matthews; that he, at that time, heard Adams talking about money he had bet and heard him say, "before I would let a man beat me out of my money, I would get a gun and kill him."

The charter of the bank was introduced in evidence, viz.: "No. 12186 Treasury Department, Office of the Comptroller of the Currency, Washington, D. C. April 29th, 1922. Whereas, by satisfactory evidence presented to the undersigned, it has been made to appear that the Republic National Bank of Dallas in the City of Dallas in the County of Dallas and the State of Texas has complied

672

with all the provisions of the Statutes of the United States required to be complied with before the association is authorized to commence the business of Banking. Therefore I, D. R. ———— Comptroller of the currency, do hereby certify that the Republic National Bank of Dallas in the City of Dallas, County of Dallas, State of Texas, is authorized to commence the business of banking as provided in Section 5189 of the Revised Statutes of the United States. In testimony whereof I have hereunto set my hand and seal this the 29th day of April 1922," which was admitted to be the regular charter of the Republic National Bank & Trust Company. The two checks which covered the two $1,000 bets are as follows: "Pay to the order of O. L. Matthews $1,000.00 Exactly One Thousand Dollars No Cents Exactly Cashier's Check H. M. Russell, Asst. Cashier." And were indorsed as follows: "Pay to the order of Clyde R. Vest O. L. Matthews Clyde R. Vest Ben C. Richards."

▇▇ Was the injury that resulted in the death of Matthews sustained by him in the course of his employment; in other words, was it shown that said injury had to do with and originated in the work, business, trade, or profession of his employer? This is the vital question for our consideration. The word "injury," as used in article 8306, § 1, R. C. S. 1925, has been uniformly construed by our appellate courts to mean an injury that has to do with and arises out of the work or business of the employer in order to be an injury sustained in the course of employment, within the Workmen's Compensation Act, and only compensable when it results from a risk or hazard which was necessarily or ordinarily or reasonably inherent in or incidental to the conduct of such work or business. Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S. W. 72, 73, 28 A. L. R. 1402; Kirby Lbr. Co. v. Scurlock, 112 Tex. 115, 246 S. W. 76, 77; United States Casualty Co. v. Hardie (Tex. Com. App.) 299 S. W. 871; Petroleum Casualty Co. v. Green (Tex. Civ. App.) 11 S.W.(2d) 388, 390; Employers' Liability Assurance Corp. v. Light (Tex. Civ. App.) 275 S. W. 685; Cudahy Packing Co. v. Parramore, 263 U. S. 418, 44 S. Ct. 153, 154, 68 L. Ed. 366, 30 A. L. R. 532; Federal Surety Co. v. Ragle (Tex. Com. App.) 40 S.W.(2d) 63; Texas Employers' Ins. Ass'n v. Bailey (Tex. Civ. App.) 266 S. W. 192; London Guaranty & Accident Co. v. Smith (Tex. Civ. App.) 290 S. W. 774; Ocean Accident & Guarantee Corp. v. Riggins (Tex. Civ. App.) 291 S. W. 276; Associated Employers' Rec. v. Simmons (Tex. Civ. App.) 273 S. W. 686; Ætna Life Ins. Co. v. Burnett (Tex. Com. App.) 283 S. W. 783; American Indemnity Co. v. Dinkins (Tex. Civ. App.) 211 S. W. 949.

Without conflict in the evidence, it was established that deceased was shot and killed by Adams because said cashier's checks were not delivered to Adams under the demands of Adams and Ramsey for the return of same.

The employer of deceased, under its charter powers as a banking institution, was and is only authorized to conduct in conformity with law the business of banking, viz.: The power to issue its promissory notes intended to circulate as money (known as bank notes); or to receive the money of others on general or special deposit, to form a joint fund that shall be used by the institution for its own benefit, for one or more of the purposes of making temporary loans and discounts, of dealing in notes, foreign and domestic bills of exchange, coin, bullion, credits, and the remission of money; and making collections for the holders of negotiable papers. See Morse on Banks & Banking, vol. 1, p. 5, § 2. And only such other business which is necessarily or ordinarily or reasonably inherent in or incidental to the conduct of the banking business.

Article 643 of our Penal Code, Rev. Cr. St. 1925, provides: "If any person shall, whether before or after the happening of any public election held under authority of law within this State, or within any town, city, county, district, precinct or any other political subdivision within the State for any purpose whatever, wager or bet in any manner whatever upon the result of any such election, he shall be fined not less than twenty-five nor more than one thousand dollars or be confined in jail for not less than twenty nor more than sixty days, or both such fine and imprisonment."

▇▇ While this statute does not denounce as illegal the act of one holding the stakes bet by parties upon the result of a public election, yet acting as such stakeholder by a bank or an officer of a bank cannot in any respect be regarded as part of the business of banking, or such an act on the part of a bank, which is necessarily or ordinarily or reasonably inherent in or incidental to the conduct of the bank's business; therefore the holding of the stakes was an act the bank was not empowered or authorized to do. The federal statutes relative to national banks constitutes the measure of authority of such corporations. They have no other powers than such as are expressly granted, and such as are necessary for carrying into effect the powers expressly granted. Logan County Nat'l Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107. National banks have no powers except such as are given them expressly or by necessary implication by the acts of Congress, passed in relation to that subject. Hansford v. National Bank of Tifton, 10 Ga. App. 270, 73 S. E. 405. Therefore, it must follow that the holding of the stakes by deceased was not an act to be classified as business of the bank, in that, deceased, in holding the stakes, was engaged

in or about the furtherance of the affairs or business of his employer, the evidence clearly establishing that the injury originated in and had to do with an illegal transaction, to wit, a bet on the result of a public election.

The fact that one of the bank's officers had held stakes in a bet upon the result of the same election, and in other elections prior thereto, can furnish no ground for holding that, in performing such services, an employee of the bank would be engaged in or about the performance of the affairs or business of the bank. "The extent of the powers of National banking associations is to be measured by the act of Congress under which such associations are organized." Bullard v. National Eagle Bank (Mass. 1873) 18 Wall. 589, 593, 21 L. Ed. 923, 925. Even if the evidence had established that the bank had authorized the deceased to act as a stakeholder in bets upon a public election, nevertheless deceased so acting would not have been engaged in or about the business of the bank. One dealing with a national bank does so with notice of, and subject to the powers conferred and the limitations imposed by, the law of its creation, within which it is secure and beyond which it cannot go. Trustees of Dartmouth College v. Woodward, 4 Wheat. 636, 4 L. Ed. 659; People's Nat'l Bank v. Southern State Finance Co., 192 N. C. 69, 133 S. E. 415, 48 A. L. R. 519; First Nat'l Bank in St. Louis v. State of Missouri, 263 U. S. 640, 44 S. Ct. 213, 68 L. Ed. 486; State of Nebraska v. First Nat'l Bank (C. C.) 88 F. 947; American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977.

We therefore sustain appellant's first assignment of error, on the grounds supra; and the judgment of the lower court is reversed, and judgment rendered that appellees take nothing by their suit against appellant, and that it recover of appellees all costs incurred in this court and in the court below.

Reversed and rendered.