AMERICAN GENERAL INS. CO. v. WILLIAMS.

No. 4585.

Court of Civil Appeals of Texas. Beaumont.

June 30, 1949.

Rehearing Denied Sept. 14, 1949.

Cecil, Keith & Mehaffy, Beaumont, for appellant.

Fisher & Tonahill, Jasper, for appellee.

COE, Chief Justice.

This is a Workmen's Compensation suit brought by Patsy Williams, alleging herself to be the surviving widow and the sole and only beneficiary of Clarence Williams, who it is alleged died in Orange County, Texas, on or about October 23, 1947, as the result of certain injuries alleged to have been received in the course of his employment while an employee of Trotti & Thomson, Inc., in Orange County, Texas. Appellee sought to recover $25.00 per week for the definite period of 360 weeks from and after the date of the death of the deceased. The defendant answered by a general denial.

At the conclusion of the testimony defendant duly moved the court to peremptorily instruct the jury to return a verdict for the appellant and against the appellee. This motion was overruled by the trial court and the cause was submitted to the jury, who returned into court its verdict, finding in substance that at the time and place in question the deceased was an employee of Trotti & Thomson, Inc.; that the injuries so sustained were accidental injuries sustained in the course of his

employment; that the fatal injuries did not have to do with or originate in the work, business, trade or profession of Trotti & Thomson, Inc.; that the injuries were not caused by the deceased's willful intention and attempt to unlawfully injure Bennie Thornton; that work call had not sounded prior to the time Bennie Thornton struck the deceased; that there was a common law marriage existing between the appellee and the deceased; that Bennie Thornton struck Clarence Williams because of matters personal between he and Clarence Williams; that Bennie Thornton did not strike Clarence Williams because of matters connected with the employment of Clarence Williams. After notice to the appellant the court granted appellee's motion for judgment, together with motion to disregard certain findings of the jury, and judgment was entered awarding to the appellee compensation in the amount of $6,-416.77, payable in a lump sum. Upon appellant's amended motion for a new trial being overruled, an appeal was properly perfected and this cause is now before us for review.

Appellant's first point complains of the refusal of the trial court to grant its motion for instructed verdict; contending that the evidence conclusively established that the deceased was not in the course of his employment at the time he received his alleged injuries. In connection with this point we think the evidence conclusively established the following: that Trotti & Thomson, Inc., was engaged in the business of building roads and bridges in Orange County, Texas, on the date of the death of Clarence Williams; that on said date and for some time prior thereto said Clarence Williams had been working for Trotti & Thomson as a common laborer; that the office and headquarters for Trotti & Thomson were located a short distance out of the city of Orange; that it was the custom of Trotti & Thomson to pick up their employees each morning at a point in the city of Orange and transport them to their headquarters and office where the various employees were assigned to their respective duties; that on the morning of October 23, 1947, as was their custom, the said Clarence Williams, together with other employees, was picked up by a truck at 4th and John Streets, in the City of Orange, and transported to the office and headquarters of Trotti & Thomson; that upon reaching that point the employees immediately became subject to the orders of Trotti & Thomson as to when and where they should begin their daily work; that on the date in question the general rule was that the employees begin their work at 7:30 o'clock A.M., however there were certain exceptions to this rule and that some of their employees might be ordered to proceed with their work at an earlier hour. This was especially true as to the deceased, Clarence Williams, whose job it was on the particular day in question to keep the concrete wetted down where a bridge was being constructed. This was at a point a short distance from the office, and the deceased was subject to being ordered to work immediately upon his arrival at the headquarters of Trotti & Thomson should there be any work necessary to be done at that time; that it was the usual and customary practice of the employees of Trotti & Thomson, after reaching their headquarters, to engage in a game played with dice commonly referred to as "craps"; that this crap game was carried on adjacent to the office of Trotti & Thomson, and that the men in charge of this work, with full knowledge that such game was being carried on, acquiesced therein and that such game was participated in by the employees generally, including the white and Negro employees, the foremen and the regular laborers in general without any distinction as to rank or color; that on the morning of October 23, 1947, such a crap game was being carried on on the premises of Trotti & Thomson, and was being participated in by several of the employees, including Clarence Williams, who was a Negro laborer and a white man by the name of Bennie Thornton who was a carpenter foreman. During the progress of the game at a time near 7:30 o'clock a white man by the name of Broom-

field was shooting the dice and had "5" for his point which meant that if he was able to make the point "5" before he made "7" on the dice he won the bet. On the other hand, if he made "7" on the dice before he made the "5" he lost his bet. While this was in progress Bennie Thornton made a side bet of 50 cents with Clarence Williams (the deceased) whereby Thornton bet that Broomfield would make his point, whereas Williams' bet that Broomfield would not make his point; that the shooter Broomfield made his point thereby winning his bet which resulted in Bennie Thornton winning his bet with Clarence Williams, and thereby became entitled to the money. There is some dispute in the record in the activities of both Williams and Thornton after Broomfield had made his point, and Thornton became entitled to the money; some of the testimony indicating that Williams at least hesitated or possibly refused to pay the bet he had lost; that he, Williams, had originally placed his 50 cent bet upon the table but when Broomfield made his point he picked the 50 cents up, whereupon Thornton demanded his money. The evidence is more conflicting as to the movements and words of the parties until finally Thornton picked up a piece of 2 x 6 and struck Clarence Williams on the head whereupon Williams was knocked off the table and his head struck some concrete. From the effects of either the blow and fall, or one of them, he died. Some of the witnesses testified that Williams said he would pay the money and had same in his hand at the time he was struck, while others testified that he was fumbling in his pockets. Thornton testified, in substance, that he thought the deceased was about to make an attack upon him, and for that reason he struck him the blow which resulted in his death.

In view of the finding of the jury upon this controverted issue that the fatal injuries to Clarence Williams, deceased, was not caused by Clarence Williams' willful intention and attempt to unlawfully injure Bennie Thornton, which finds ample support in the evidence, we will not go into the details of such evidence. As a result of the fatal injuries to Clarence Williams, Bennie Thornton was charged and plead guilty to the offence of negligent homicide and paid a fine therefor. The evidence further excluded the idea of "antecedent malice existing in the mind of the assailant, Bennie Thornton, against and towards Clarence Williams, deceased, at the time of the blow." It affirmatively appears that no previous trouble existed between Thornton and Williams, and that neither harbored any ill will toward the other. It is upon this state of the evidence that appellant contends that the fatal injuries sustained by Clarence Williams were not sustained in the course of his employment; first because the work call had not been given and therefore Clarence Williams was not actually engaged in the performance of his duties as a workman for his employer, and, further, because the evidence conclusively shows that the injuries did not have to do with and originate in the work, business, trade or profession of this employer. Appellant has cited many cases supporting the contentions made, among which is Aetna Life Insurance Co. v. Matthews, Tex.Civ.App., 47 S.W.2d 667; Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402; Associated Employers Lloyds v. Groce, Tex.Civ.App., 194 S.W.2d 103; Fidelity & Casualty Co. of New York v. Cogdill, Tex.Civ.App., 164 S.W.2d 217.

The word "injury" as used in Article 8309, Sec. 1, Vernon's Civil Statutes, has been uniformly construed by appellate courts to mean an injury which has to do with or arises out of the work of the employer in order to be an injury sustained in the course of employment within the Workmen's Compensation Act, and only compensable when the results from a risk or hazard which was necessarily or ordinarily or reasonably inherent in or incidental to the conduct of such work or business. We are convinced that Clarence Williams was in the course of his employment at the time he received his fatal injuries in the sense that he was upon his employer's premises for the purpose of

pursuing his labor as an employee, and was subject to the orders of his employer at the very time he received his injuries. Aetna Casualty & Surety Co. v. England, Tex.Civ.App., 212 S.W.2d 964 and cases there cited. The difficult question to determine is whether the deceased's injuries had to do with and arose out of the work or business of the employer. This we conceive to be a conclusion of law to be applied to the facts and is for the courts to determine, and when the facts are such as in this case it is not for the jury to say that the injuries did or did not have to do with and arise out of the work or business of the employer. This legal conclusion requires a construction of Article 8309, supra, to determine whether an injury received under the given state of facts is compensable. The courts of this State are committed to the rule that the Workmen's Compensation law should be liberally construed to afford relief to injured employees, and not to defeat the purpose for which the law was enacted, including the right to compensation. This rule is too well established to require citations. In the early days of our compensation statute the courts were slow to discard the common law rules applicable to tort actions, and it seems they were inclined to place a much stricter interpretation upon the compensation laws than the courts of today. Consequently many claimants were denied compensation who would, under the later decisions, be permitted to recover. This we feel to be true, especially in assault cases. A very scholarly and enlightening opinion demonstrating the tendency of the courts of various jurisdictions to adopt a more liberal construction in compensation cases was written by Judge Rutledge in the case of Hartford Accident & Indemnity Co. v. Cardillo et al., 72 App.D.C. 52, 112 F.2d 11, 14. In this case the court overruled the appellant's contention that the injury did not arise out of the employment, and that it was caused by a purely personal quarrel between the claimant and another. In the course of the opinion it was said: "* * * Nor is it necessary, as these cases show (referring to cases discussed), that the

particular act or event which is the immediate cause of the injury be itself part of any work done for the employer by the claimant or others. Otherwise no award could be given for many injuries now compensated, such as those caused by stray bullets, unexplained falls, objects falling from outside the employer's premises and work, and many street risks, horseplay, most assaults and many other causes. 'The risks of injury incurred in the crowded contacts of the factory through the acts of fellow workmen are not measured by the tendency of such acts to serve the master's business.' Not that the act is in the line of duty, or forwards the work, or creates special risk, but that the work brings the employee within its peril makes it, for purposes of compensation, 'part of the work'", and further "The statutory abolition of common law defenses made easy recognition of the accidental character of negligent acts by the claimant and fellow servants. The extension to their accidental * * * behavior was not difficult. So with that of strangers, including assault by deranged persons, and their negligence intruding into the working environment. But these extensions required a shift in the emphasis from the particular act and its tendency to forward the work to its part as a factor in the general working environment. The shift involved recognition that the environment includes associations as well as conditions, and that associations include the faults and derelictions of human beings as well as their virtues and obediences. Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional makeup. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up."

In discussing the different views adopted by the courts in either allowing or refusing compensation in assault cases, we find

the following: "The other view rejects the test of immediate relevancy of the culminating incident that is raised, not as isolated incidents but as a part and parcel of the working environment, whether related directly to the job or to something which is a by-product of the association."

■■ Here the crap game in which the deceased was participating at the time of his injuries had truly become a part of his working environment. Here it is conclusively shown that employees of Trotti & Thomson habitually participated in this form of amusement or entertainment with the full knowledge and acquiescence of their employer, and, to the extent that the responsible representatives of the company participated in such games, were encouraged. Such an event, as did happen, should have reasonably been foreseen by any reasonably prudent person living in this section of the southland. Whether justified or not, trouble is to be expected to arise from such games when participated in by both white and Negroes. It is common knowledge that much less is required on the part of a Negro to bring about serious trouble with a white man than would be as between two white men or two Negroes. Under the uncontroverted evidence we feel that we are justified in holding that Clarence Williams received his fatal injuries while in the course of his employment for Trotti & Thomson, Inc., and that they arose out of such employment. Hartford Accident & Indemnity Co. v. Cardillo et al., supra; Southern Surety Co. v. Shook, Tex.Civ.App., 44 S.W.2d 425; Cassell v. U. S. Fidelity & Guaranty Co., 115 Tex. 371, 283 S.W. 127, 46 A.L.R. 1137.

■ By appellant's second point it complains of the action of the trial court in refusing to peremptorily instruct the jury to return a verdict for appellant, contending that the evidence established, as a matter of law, that there was no valid existing common law marriage between the appellee and the deceased. We will not undertake to set out the testimony which we are convinced was sufficient to support the jury's finding to the effect that the claimant was the common law wife of the deceased. The evidence was sufficient to establish every element of the common law marriage between these parties in either the year of 1932 or 1933 which continued down until the death of Clarence Williams.

■ By point three appellant complains of the refusal of the trial court to submit certain requested Special Issues raising the right of self defense upon the part of Bennie Thornton against the attack of Clarence Williams when such was raised by the testimony. These issues inquired whether or not Thornton reasonably believed from the acts and conduct of Williams that Williams was about to attack him and whether or not it reasonably appeared to Thornton that bodily injury was about to be inflicted upon him by Williams, and if the jury so found whether or not Thornton acted on a reasonable apprehension or fear that Williams was about to inflict injury upon him. We see no merit in these points. Although the evidence was sufficient to raise the issue that Thornton struck the deceased because he believed that the deceased was in the act of making an assault upon him, we are unable to perceive how the state of Thornton's mind could affect the right of appellee to recover; the controlling issue being whether or not the deceased was in fact attempting to unlawfully injure Bennie Thornton. This issue having been submitted to the jury and found in favor of the claimant, what Thornton reasonably believed that Williams was in the act of doing is immaterial.

■ Among other things the trial court instructed the jury as follows: "You are instructed that in passing on the question of whether the employee received an injury caused by the employee's willful intention and attempt to unlawfully injure some other person that no verbal provocation justifies an assault and battery." By appellant's fourth point they complain of the action of the trial court in overruling its exceptions to the phrase "no verbal provocation justified an assault and battery" as being a comment on the weight of the evidence and in effect charged the

jury that Thornton was not justified in striking Clarence Williams, although he might have heard some statements that were calculated to provoke Bennie Thornton to strike him. This charge had to do with and referred to the Special Issue submitted to the jury, inquiring whether Clarence Williams' injuries were caused by his willful intention and attempt to unlawfully injure Bennie Thornton, and therefore had no reference to the acts and conduct of Thornton in making the fatal assault upon Clarence Williams. Complaint is made in appellant's fifth point of the action of the trial court in granting appellee's motion to disregard certain findings of the jury and in entering judgment for appellee, contending that such Special Issues that were so disregarded were supported by the testimony adduced upon the trial of this cause. These Issues being: No. 4—"Do you find from a preponderance of the evidence that the fatal injuries sustained by. Clarence Williams, deceased, had to do with and originated in the work, business, trade or profession of Trotti & Thomson, Inc., to which the jury answered 'No'." No. 6: "Do you find from a preponderance of the evidence that work call had sounded prior to the time Bennie Thornton struck Clarence Williams over the head with a piece of wood, to which the jury answered 'No'." Special Issue No. 11: "Do you find from a preponderance of the evidence that Bennie Thornton did not strike Clarence Williams because of matters personal between Bennie Thornton and Clarence Williams to which the jury answered—because of personal matters;" and Special Issue No. 12—"Do you find from a preponderance of the evidence that Bennie Thornton struck Clarence Williams because of matters connected with the employment, of Clarence Williams, to which the jury answered 'No.'" The trial court, upon motion and notice, entered judgment for appellee, disregarding the foregoing issues and the jury's answers thereto on the theory that there was no support in the evidence for the jury's findings, and that such findings were immaterial and of no force. What

we have already said with reference to deceased's fatal injuries originating in the work, business and trade of Trotti & Thomson indicates our opinion that Special Issue No. 4 should not have been submitted to the jury. As stated before, as we view the evidence in this case it is conclusively shown that the deceased met his death at the hands of Bennie Thornton, resulting from the controversy arising out of a bet made in the crap game heretofore discussed. The facts being thus established, we think it becomes a question of law as to whether the fatal injuries sustained by Clarence Williams had to do with and originated in the work, business, trade or profession of Trotti & Thomson, Inc. As to Special Issue No. 6, in view of the facts heretofore stated it was immaterial as to whether work call had been sounded prior to the time Bennie Thornton struck Clarence Williams. As to Special Issue No. 11 and the jury's answer thereto we are convinced that under the rule announced in Vivier v. Lumbermen's Indemnity Exchange, Tex.Com.App., 250 S.W. 417, the evidence did not raise a defense under Article 8309, Section 1, Subdvn. 5, Exception No. 2, which reads in part as follows: The term "injury sustained in the course of employment" as used in this law shall not include: No. 2 "An injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment." The rule as there announced is—"Such assault must be prompted by antecedent malice existing in the mind of another, causing the other to follow the employee and inflict injury upon him, wherever he was to be found. Or to cases where the employee, by his own initiative, provoked the difficulty which caused the other party to feel a personal interest in assaulting him." This rule was followed in Southern Surety Co. v. Shook, supra, by the Court of Civil Appeals of Eastland, writ of error refused, and we take it to be the law. Under the facts of this case no defense arose under the exception above referred to and the issue

should not have been submitted to the jury. Further, the exception referred to has to do with assaults for reasons personal to the injured employee and not to assaults personal to the person making the assault. What we have said with reference to Special Issue No. 4 applies to Special Issue 12, and the jury's answers thereto. We feel there was no error on the part of the trial court in disregarding the issues and the jury's findings thereon.

Appellant's remaining Points of Error contend that the findings of the jury to Special Issues Nos. 4, 6, 11 and 12 are indirect and irreconcilable with the jury's finding to Special Issue No. 3, and, further, that the jury's finding to Special Issue No. 6 is in conflict with the jury's finding to Special Issue No. 1, and therefore no judgment could rightfully be entered upon such verdict. The jury's finding to Special Issue No. 1 is to the effect that Clarence Williams, deceased, was an employee of Trotti & Thomson, Inc., in Orange County on or about October 23, 1947, at the time and place in question described, and to No. 3 that the fatal injuries sustained by Clarence Williams, deceased, on or about October 23, 1947, were injuries sustained in the course of his employment as an employee of Trotti & Thomson, Inc. If we are correct in holding that the trial court should not have submitted Issues Nos. 4, 6, 11 and 12, and was authorized to disregard same, his act in so doing removed any conflict that might have existed, leaving Special Issues 1 and 3, and the jury's answers thereto, in full force and effect. From what we have said it follows that we are of the opinion that no error is shown requiring a reversal of the judgment of the trial court; therefore the same is affirmed.